**T. P. TACKETT, Appellant,**

v.

**The STEPHENVILLE STATE BANK, Appellee.**

**No. 3181.**

Court of Civil Appeals of Texas.

Eastland.

Oct. 7, 1955.

Rehearing Denied Oct. 28, 1955.

Joseph A. Chandler, Stephenville, for appellant.

Ennis Favors, Sam M. Russell, Stephenville, for appellee.

LONG, Justice.

T. P. Tackett instituted this suit against the Stephenville State Bank to recover double the amount of usurious interest alleged to have been paid by him to the bank on 116 promissory notes. The Bank contended that it had not loaned money to Tackett but, on the contrary, had bought invoices on goods manufactured by Tackett and that the notes had been given to secure and guarantee the payment of such invoices. Upon a trial before the court with the aid of a jury, the jury found that Tackett borrowed money as represented by the notes introduced in evidence from the Bank; that it was agreed between Tackett and the Bank that the notes, which were not usurious on their face, would be paid from proceeds from the invoices; that the notes were executed and delivered by Tackett to the Bank conditionally guaranteeing the invoices; that the Bank accepted the notes as a conditional guarantee for the invoices sold on that particular occasion and that the amounts paid to the Bank by Tackett were for discounts for the sale of invoices. The jury failed to answer special issue No. 4 inquiring whether the notes offered in evidence, dated from November 21, 1952 to December 7, 1953, were made due and payable to the Bank 90 days from their due date as a scheme and subterfuge to avoid the usury laws of this State.

The jury, on November 4, 1954, returned into open court with their verdict and the court determined the answers of the jury to the first three special issues were in irreconcilable conflict with the answers of the jury to the last three special issues and so advised the jury and sent it back for further deliberations. Thereafter, the jury returned into open court with its verdict without making any change in the answers to said special issues and the court accepted said verdict, discharged the jury and it was filed and entered in the minutes of the court.

On November 5, 1954, the defendant filed a motion for judgment notwithstanding the verdict of the jury. Said motion, among other things, was on the ground that at the close of the evidence the court should have granted the motion of defendant for an instructed verdict. The court granted said motion for judgment notwithstanding the verdict and entered a judgment that Tackett take nothing. The court found in said judgment, as a matter of law, that the judicial admissions made while testifying by the plaintiff Tackett and by his auditor, Carl Crimmins, that the transactions before the court were sales of invoices rather than loans and admitted positive and definite facts which defeat the plaintiff's right to recover and as such judicial admissions were not subsequently modified or explained showing a slip of the tongue or a mistake in such testimony, the facts are conclusive.

The court further found that said judicial admissions coincided and agreed with the pleadings and proof of the Bank. From this judgment, Tackett has duly appealed.

The record discloses that Tackett, since 1944, has been engaged in manufacturing wearing apparel for women in the city of Stephenville; that for a period of years, beginning in June, 1952, Tackett obtained from the Stephenville State Bank various sums of money. It was the contention of Tackett that he was borrowing the money from the Bank for the purpose of carrying on his business. It was the contention of the Bank that it was buying invoices from Tackett at a discount of two per cent. The Bank further contended that the notes in question executed by Tackett to the Bank were given to guarantee that Tackett would not build an invoice until after he had received an order and shipped the same and that the merchandise would be accepted by the retail store buyer.

The trial court took the view that Tackett and his auditor, Carl Crimmins, had both testified positively that the notes were given to guarantee the invoices as contended by the Bank and that the Bank was not loaning Tackett money but was buying invoices.

It is conclusively shown that Carl Crimmins was not the agent or employee of appellant at the time of the trial. He had long since severed his connection with appellant. He was called as a witness by appellee. Appellant was not bound by his testimony. The testimony of Crimmins could not be classed as a judicial admission. Delgado v. Delgado, Tex.Civ.App., 253 S.W.2d 708.

We will next consider whether the evidence of Tackett was such that it constituted a judicial admission and that the court was justified in rendering judgment against him. We have carefully studied the statement of facts. Tackett testified positively on direct examination that he was borrowing money from the Bank; that he was not selling the Bank invoices at a discount; that the invoices were given as collateral for the money he was borrowing.

Appellant testified upon cross examination as follows:

"Q. Now, Mr. Tackett, you contend, I believe, that you put your invoices up there at the Bank as collateral? A. Yes, sir.

"Q. To secure this note when you signed that note, is that right? A. Yes, sir.

"Q. You didn't have any conversation with Mr. Maguire about selling him $1,934.50 worth of invoices at that particular time, did you? A. I must have to arrive at that odd figure.

"Q. Now, Mr. Tackett, as a matter of fact you sold him $1,934.50 worth of invoices at that time and he discounted them two per cent and gave you back $1,895.81, didn't he? A. That was what was deposited to my account; yes, sir.

"Q. And you actually sold him that many invoices in that transaction, didn't you? A. Yes, sir.

"Q. Of course you did. Those invoices went out of your hands never to return again unless the merchandise was rejected and then you had the right to substitute that with other invoices, didn't you? A. Yes, sir.

"Q. That's true. Now, Mr. Tackett, that is true with every one of these notes that has been introduced in evidence here. For example, I will just take any one of them here. There is one right there for $2,300.00, dated July 25, 1953? A. Yes, sir."

* * * * * *

"Q. You make up a lot of invoices down there in the privacy of your office, don't you? A. Yes, sir.

"Q. And you sold a lot of them to The Stephenville State Bank, didn't you? A. I sure did."

* * * * * *

"A. No. Will you please ask me what you just asked me there?

"Q. Well, I ask you if Mr. Maguire didn't mark the note paid and give it back to you after the bank received the money for the particular invoices that you sold on the occasions you put the note up? A. Yes, he gave me the note.

"Q. Why, of course, he did. Now, Mr. Tackett, you set out here something like a 116 or 118 notes there when you started, didn't you? A. Yes, sir.

"Q. Of course, you are down now to about 105 or 106, aren't you. You have drawn one out here, and you are down now considerably less. But on each occasion when you gave one of those notes that has been introduced in evidence you carried invoices down there to the bank and sold them, and you gave that note to guarantee the payment of those invoices, didn't you? A. Yes, sir."

* * * * * *

"Q. But you gave the note to the bank to guarantee that the invoices were bona fide, and was built upon an order that you had received, built upon an order that you had shipped, built

upon an order that would be accepted at the other end of the line. Now, that was what you were doing when you gave that note, weren't you? A. Sure."

\*     \*     \*     \*     \*     \*

"Q. And, Mr. Tackett, you, then after that, about four or five days, you got the idea of selling your invoices to the bank, didn't you? A. No, sir. I didn't get up that idea.

"Q. You didn't? A. No, sir.

"Q. Whose idea was that? A. Doctor Terrells.

"Q. What did the Doctor say to you then about that business? A. He told me that the invoices should be discounted through the bank, and he thought it would give me sufficient capital to operate on, and that Mr. Maguire would handle it and that the notes he held on me he would run through the bank as I built up my net worth or bank balance, or did business enough to absorb it.

"Q. The Doctor told you that you could sell your invoices down there at the bank at a two per cent discount and go on operating. That is substantially what he told you, wasn't it? A. Right."

\*     \*     \*     \*     \*     \*

"Q. Now, you say that an assignment of your invoices. You didn't have any doubt but that you were parting with title with your invoices when you signed that, did you? A. No. I had already parted with title when they hit it with a red stamp, sir.

"Q. That's right. It had gone out of your hands completely. A. Yes, when it was mailed from the bank.

"Q. That's right. You sold it right then and there, didn't you? A. I never did know why we needed that. (Meaning stamp)."

\*     \*     \*     \*     \*     \*

"Q. Now, Mr. Tackett, approximately how many invoices did you say

sold The Stephenville State Bank from June 4, 1952 until December—when did you quit—December 31, 1953? A. December of 1953, sir.

"Q. Approximately how many invoices would you say you sold the bank altogether? A. How many months is that?

"Q. That's about 18 or 19 months, isn't it? A. Yes, sir. Say 18 months. Our invoices—we averaged the amount of each one for this law suit purpose and it was $49.85, and for the 18 months period we did over $200,000.00 worth of business at $50.00 an invoice. A thousand dollars would be 20 invoices. $200,000.00 would be 4,000 invoices.

"Q. You sold about 4,000 invoices you think? A. About, yes."

\*     \*     \*     \*     \*     \*

"Q. Now, Mr. Tackett, of course, when you turned the invoices over to the bank, by that assignment there, they were forever gone from you? A. Yes, sir.

"Q. You had no further control over them, and they belonged to the bank thereafter, didn't they? A. The invoices?

"Q. Yes, sir. A. Yes, the bank in effect had bought those but I had signed a note for them. I was still responsible for the note. If they had not been paid the bank would have held me responsible.

"Q. You signed the note, but that is not what I am talking about. When you carried those invoices down there to the bank and got your money, you had turned your invoices loose, had sold them outright, you had no further control over them whatever, did you, except when one was rejected by the retail store buyer, rather than be called upon to make good under the note, you could substitute another invoice for that, couldn't you? A. Yes.

"Q. And you did that frequently, didn't you? A. I wouldn't say frequently, no. Infrequently.

"Q. Mr. Tackett, you shipped one time about $800.00 worth of merchandise to Mangold's, didn't you? Is that the name of that outfit? A. Yes, sir. It's a triple A one rated account with, 226 stores, sir.

"Q. You sold that particular invoice to The Stephenville State Bank, didn't you? A. Sure did."

\*  \*  \*  \*  \*  \*

"Q. Well, you did have invoices rejected that you had sold The Stephenville State Bank during the period of transaction here, and you did substitute those invoices with other invoices, didn't you? A. I didn't have invoices rejected; no, sir. I had credit memorandums—

"Q. Well, I mean orders—A. No, nor orders rejected. I had credit memorandums. There would be a faulty zipper, or maybe we sent red when we should have sent navy, or we would get a return of three pieces or eight pieces. You can't satisfy everybody.

"Q. Then you would ship them something else to satisfy them, and then make another invoice for that. You would bring that over to the bank, and that would take up the slack that you had? A. Well, no. Lots of occasions you couldn't ship them anything else. But I had new invoices coming all the time, and Mr. Maguire simply absorbed that in the notes when he made it there.

"Q. You would make a new invoice and take it up there, and substitute it once? A. Yes, sir.

"Q. That had been voided by the merchandise rejected? A. That a portion thereof had been rejected.

"Q. By that method you never were called upon to make good a single one of these notes, were you? A. No, they were all paid.

"Q. They were all paid with those invoices? A. Sure were.

"Q. And you personally never had to dig down in your pocket and pay for one of them, did you? A. No, why should I?"

\*  \*  \*  \*  \*

"Q. Mr. Tackett, when you answered him there, you said you didn't execute anything else in writing. You didn't mean to omit that you had notified J. C. Penney that you sold your invoices to the bank, did you? You did write them? A. Yes, we did.

"Q. And I showed that awhile ago? A. Yes, you did.

"Q. And that acknowledged it and they said they would honor your selling your invoices to the bank? A. Yes.

"Q. For the purpose of the jury and for the court, and myself, and knowing what your invoices are, is that the invoice there that you use in your business? A. Yes, sir.

"Q. That's the invoices that you sold to the bank? A. Yes."

Appellee contends that the above testimony conclusively shows that Tackett was selling invoices to the Bank and was not borrowing money from it: that said evidence was not thereafter modified or explained by Tackett and that he is therefore bound thereby.

Tackett also testified on cross examination and re-direct examination, as follows:

"Q. Well, then, you said after you delivered these invoices over there you managed to get some money. Now, just how did you do that? A. Mr. Maguire would total these invoices, whatever that total would be—it may be quite large or quite small—depending again on the season. And we have, say, to make it easy, a $1,000.00 there, and Mr. Maguire says 'All right, we will loan you a $1,000.00 on these invoices.' He would deposit $980.00

to my account and give me a deposit slip. The Company would send the check direct to Mr. Maguire because the invoice was stamped by Mr. Maguire before he mailed it to the effect that it was payable to the bank. Further, we had an assignment with the Penney Company in New York, a legal standard document that they use, an assignment, and the check would be mailed at the consequence thereof directly from New York straight through The Stephenville State Bank in a period of 15 to 18 days, Mr. Favors."

\* \* \* \* \*

"Q. Why did you give that note? A. Because they required it of me. I have often wondered.

"Q. What did they say to you though that caused you to give a note? A. They said, 'Look here, you are borrowing $2,000.00 here; we want to know old boy in addition to the invoices—the assignment.' Along that line, Mr. Favors.

"Q. Well, now, can't you get at it a little better than that? They surely said a little more than that, didn't they? You were dealing mostly with Mr. Maguire. You were looking to him. Now, let's get substantially what you said to him, and when you signed that note. To the best of your recollection. You got the advantage. I'm just asking you for your best recollection. Tell the jury. A. From the beginning the bank required notes in addition to the invoices, Mr. Favors. From the beginning. There was never any variance. And I was simply told that the notes were to secure their payment; secure the fact that the account was paid.

"Q. That's right. It was given to guarantee that the account was paid? A. I assume that's the reason—

"Q. Assume—you know it was, don't you? A. I don't know, Mr. Favors, such a thing, no.

"Q. You discussed it with Mr. Maguire numerous times, didn't you? A. Sure, I discussed my business with Mr. Maguire. I've got a big business. I had to discuss it with the bank."

\* \* \* \* \*

"Q. And you gave that note to guarantee that transaction, didn't you? A. I gave the note—I assume it was guaranteed—I gave the note because the bank required it, Mr. Favors.

"Q. Well, Mr. Tackett, you are 21 years of age, you are in business, and don't you know why you gave the note? A. I assume it was to guarantee the merchandise. I assume it, Mr. Favors. Actually, I was told there must be a note given at the time each loan was made over and above the invoice. They had the invoices, the accounts assigned in New York, plus the notes."

\* \* \* \* \*

"Q. Wasn't it a fact that you knew that you were never going to be liable on those notes any way, and you didn't care whether they were marked paid or not? A. That is not true, sir.

"Q. That's not true? A. No, sir.

"Q. You didn't know whether the invoices were going to be paid or not, didn't you? You thought they were, didn't you? A. They were being paid, sir.

"Q. Well, if they were being paid that would take care of the note and you would never be personally liable, would you? A. If the notes were paid I wouldn't be personally liable; no. Not after it was paid. But the longer my signature is on that note I'm personally liable.

"Q. If the invoices though were paid that you sold them on that particular transaction you would never be liable on that note, would you? In fact, you didn't care whether the note was paid or not, did you? A. No, that is not true, sir."

* * * * *

"Q. Now, Mr. Tackett, of course, when you turned the invoices over to the bank there, by that assignment there, they were forever gone from you? A. Yes, sir.

"Q. You had no further control over them, and they belonged to the bank from thereafter, didn't they? A. The invoices?

"Q. Yes, sir. A. Yes, the bank in effect had bought those but I had signed a note for them. I was still responsible for the note. If they hadn't been paid the bank would have held me responsible."

* * * * *

"Q. Now, Mr. Tackett, was all those transactions satisfactory with you from June 4, 1952 until about December something of 1953, when you quit? A. No.

"Q. Why weren't they satisfactory with you? A. I was being handled on interest—I was paying exorbitant costs for operating money. I complained numerable times."

* * * * *

"Q. When did you first make up your mind that you had a big lawsuit against the bank, Mr. Tackett? A. I don't know. About the second time I borrowed money on this arrangement. * * *."

* * * * *

"Q. Mr. Tackett, the course of operations that you have described here in the making of notes that you have described, was that the source of the money that you had to operate your business on? A. Yes, sir.

"Q. Except for the two or three instances you mentioned when you got the money, and you had reached your limit, or were told that you had reached your limit, you borrowed all of your money throughout this time in this manner through The Stephenville State Bank? A. Yes, sir."

* * * * *

"Q. Mr. Tackett, the charges shown as interest there, are what charges? A. Charges accumulated with my dealings at The Stephenville State Bank.

"Q. Were these amounts of difference between the notes that you executed shown on the face of the notes and the amount that you received? A. Yes, sir.

"Q. Is that what went into the interest there? A. Yes, sir.

"Q. These statements showing those were submitted each month to The Stephenville State Bank? A. Yes, sir."

* * * * *

"Q. Was Tackett Manufacturing Company at that time paying interest to anybody but to The Stephenville State Bank? A. No, sir."

■ A careful examination of his evidence discloses that there are contradictions therein. Under these circumstances, conclusive effect cannot be given to his testimony on cross examination but a fact issue is presented thereby for the determination of a jury. The testimony of Tackett relied upon by the Bank to show judicial admissions does no more than contradict his other testimony.

In the case of United States Fidelity & Guaranty Co. v. Carr, Tex.Civ.App., 242 S.W.2d 224, 229 (Writ Ref.), the court said:

"If the statement merely contradicts some other portion of the party's testimony, conclusive effect cannot be given thereto, but a fact issue is presented for the determination of the jury or the judge sitting without a jury as in the case of an ordinary witness. Leonard v. Smith, Tex.Civ.App., 186 S.W. 2d 284; New St. Anthony Hotel Co. v. Pryor, Tex.Civ.App., 132 S.W.2d 620."

This court, in Hudson v. Hudson, Tex.Civ.App., 265 S.W.2d 137, followed the rule above announced. It is also the law that a party is not bound by inconsistent statements made on cross examination.

In 20 Am.Jur. 1032, Sec. 1181, this rule is laid down:

"A party testifying does not do so at the peril of having every slip of his tongue taken as conclusively true, nor is he absolutely bound by inconsistent statements made on cross examination."

We do not believe the evidence, when properly construed, conclusively shows that Tackett was not borrowing money from the Bank but, on the contrary, was selling his invoices to the Bank at a discount. In our opinion, the trial court erred in rendering judgment for the Bank.

The judgment of the trial court is reversed and the cause is remanded.